UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Amber Koelling,                )
                               )
    Plaintiff,         )
                               )
v.                             )   No. 14 CV 50018
                               )   Magistrate Judge Iain D. Johnston
Carolyn W. Colvin, Acting      )
Commissioner of Social Security, )
                               )
    Defendant.         )

## MEMORANDUM OPINION AND ORDER

Plaintiff Amber Koelling brings this action under 42 U.S.C. §405(g), seeking remand of the decision denying her disability insurance benefits. This matter is before the Court on cross-motions for summary judgment.

## INTRODUCTION

This Court can only imagine how many drug-abusing applicants seeking government handouts Social Security Administrative Law Judges see annually. And this Court understands that recognizing the sometimes subtle distinction between applicants whose mental disorder causes the applicants to abuse drugs compared to applicants whose drug abuse triggers mental disorders can be difficult to discern at times. Because of these two phenomena, it is critical that Administrative Law Judges carefully review the facts of each case and properly apply the applicable statutes, regulations, rulings and case law so that those who are ineligible are not provided with benefits, but that mentally impaired applicants who are legally disabled are not erroneously turned away. Moreover, this process must be adequately explained in the decision. The Court understands that this task is not always easy, but the task is nonetheless necessary.

This case involves a drug abuser who never once held gainful employment, but who also suffers from severe mental health issues. This case also involves an Administrative Law Judge who failed to carefully review the facts and properly apply the law. Although remand is clearly warranted, this Court makes no determination as to whether plaintiff is entitled to benefits. *Moore v. Colvin*, 743 F.3d 1118, 1124 (7th Cir. 2014).

## BACKGROUND

Plaintiff first began struggling with depression sometime around 6th grade, at a time when her father left the family. R. 285. She failed both 6th and 7th grade and did not complete the 8th grade, dropping out of school.

On March 19, 2010, plaintiff tried to kill herself by driving her brother's car into a tree. R. 302. This was the first of five suicide attempts. In the hospital, she tested positive for cocaine, marijuana, opioids, and benzodiazepines, and was diagnosed with major depressive disorder, panic disorder, anxiety disorder, and polysubstance abuse. R. 82, 302. She was hospitalized for six days. R. 82, 302, 370. This was plaintiff's first hospitalization for mental health purposes.

On March 25, 2010, she filed an application for supplemental social security income and an application for child's insurance benefits. R. 75.

One month later, in April 2010, plaintiff became more depressed and was viewed as suicidal. She was admitted for five days at Memorial Medical Center and diagnosed with major depression. R. 82. This was plaintiff's second hospitalization for mental health purposes. On admission, she was assessed a GAF of 40 and then a 60 on discharge. R. 389. Lab tests again were positive for various illegal drugs. R. 82, 302.

2

In June 2010, when she was 18 years old, plaintiff began seeing psychiatrist Ramesh Vemuri. Dr. Vemuri diagnosed her with polysubstance abuse and bipolar disorder and prescribed various medications. In his first evaluation, he observed the following:

> Her present mental status evaluations shows tall, ectomorphic, normocephalic, neatly dressed pleasant, White female. She is like a wallflower. She is very pretty and pleasant but does not have any emotion or empathy. She does not see anything wrong sleeping with guys for drugs, not having a life for herself, or a place to live (as she lives with her mother then goes to her grandmother). Her brother does not like her because she totaled his car so she cannot go back there. [S]he has some delusional perceptions and paranoid thinking. Even though she claims she has attention deficit disorder and was given Adderall in high school, she claims she has difficulty and attention problem[s] in a small room with two people in an interview setting. She denies any hallucinations.

R. 395.

On December 10, 2010, Dr. Vemuri wrote a letter stating that he had diagnosed plaintiff with major depression and ADD. R. 439. Here are the relevant portions of the letter:

> Amber is a 19-year-old female followed by me since June 11, 2010 for her delusional depression. Since then she stopped using drugs except one episode of relapse in October where she used cocaine. Other than that, she stopped using alcohol, marijuana, and other mood-altering drugs.
>
> Even though she looks better physically, she still continues to have paucity of thinking, continued paranoid thoughts about people not liking her, thinking bad about her, etc. She is still very guarded and has difficulty concentrating, focusing, and retaining information. In fact, the mother has to come and tell me that she needed this letter as she was denied social security, wanted to appeal, and needed a letter from her psychiatrist.
>
> When I saw her initially, I thought her depression and paranoia could be from the drugs. Now, she has been off of drugs for almost six months without any improvement in her affective symptoms where she continues to feel helpless, hopeless, withdrawn, and has trouble concentrating, trouble formulating or thinking thoughts, and expressing herself. Her affect is flat and [she] continues to have paranoid thinking that is not responding to medication.

R. 439.

On December 24, 2010, plaintiff was taken to the hospital where she told doctors she had gone to a man's house and drank, smoked marijuana, and took "some kind of pill." R. 453. As the man was driving her home, he sexually assaulted her. When she resisted, he pushed her out of the car, and she then called 911.

On December 30, 2010, Dr. Vemuri completed a disability answer sheet, stating that he began treating plaintiff on July 10, 2010 and had seen her on a monthly basis. R. 464. He rated her limitations in activities of daily living and maintaining social function as extreme and her concentration, persistence, or pace as moderate. R. 469. He checked the box indicating that she had four or more episodes of decompensation within the last 12 months.[1] *Id.* Dr. Vemuri wrote that plaintiff had stopped using drugs and alcohol since 2010 and yet showed no improvement with psychosis. R. 471.

On January 25, 2011, plaintiff was again hospitalized from a drug overdose. R. 485. She told doctors that she became depressed, although she claimed not to be suicidal, and took 45 tablets of clonazepam and 15 tablets of trazodone and went to sleep. She was diagnosed with bipolar depression and anxiety disorder. R. 491. This was the third hospitalization for mental health purposes. She was discharged on January 29th. R. 514.

On October 5, 2011, plaintiff was admitted to the Centegra Health System because of depression. R. 604. She was discharged on October 7th. *Id.* This was plaintiff's fourth hospitalization for mental health purposes in less than 18 months.

On January 13, 2012, plaintiff was admitted to the Maryville Scott Nolan Center with problems apparently relating to depression. R. 558. The records are not detailed about the reasons for this visit, but a nursing assessment states that plaintiff reported that her boyfriend

---

[1]The form defined "episodes of decompensation," and included both the bright-line and equivalency tests, discussed below. R. 469.

4

overdosed on heroin two days earlier; she did not like her mom; she was worried about social security getting approved; and because she was worried about hurting herself, she called 911. R. 568. She was diagnosed initially with a GAF of 30. R. 562. She stayed seven days. R. 594. The discharging psychiatrist noted that plaintiff "should be provided a highly structured environment" at home. R. 595. This was the fifth hospitalization for mental health purposes in 20 months.

On May 15, 2012, which was the day plaintiff's administrative hearing was initially scheduled, she was admitted to Northern Illinois Medical Center. R. 615. A doctor there summarized the history of the present illness as follows:

> Patient is a 20 year old white female who was admitted to the medical floor unresponsive, lethargic, and patient was found to have empty bottles of her Geodon, Klonopin, lorazepam. Patient tested positive for phencyclidine, benzodiazepine, amphetamine and cannabinoids in a drug screen test upon arrival. Patient went into respiratory arrest, patient was intubated. Patient was extubated and while she was extubated, patient was telling everybody how sorry she [was] about trying to kill herself. When I confronted the patient, patient reported feeling depressed, lonely, upset. Patient reported missing her boyfriend, missing her father. Patient reported that she took 15 doses of trazodone. She took amphetamines, she took Klonopin and lorazepam and the Geodon and she fell asleep. Patient reported at this point, she wanted to fall asleep and never wake up. Patient has a history of multiple psychiatric admissions and multiple suicide attempts. This is suicide attempt #5. Patient still is having suicidal thoughts, denies having suicidal plans for today.

R. 620. The doctor rated her GAF as 30 and recommended that she be transferred to the psychiatric unit. R. 620, 622. She stayed in the hospital at least four days. R. 628.[2] This was the sixth hospitalization for mental health purposes in less than 24 months.

On June 14, 2012, a rescheduled hearing was held before the Administrative Law Judge ("ALJ"). The hearing was done by video teleconferencing with the ALJ and the medical expert in Evanston, Illinois, and plaintiff and her representative in Rockford. R. 33. Plaintiff was then

---

[2] It is not clear on what date she was discharged.

20 years old and had no formal work history, although she worked informally as a nanny without being paid. R. 39.[3] She testified that she saw Dr. Vemuri every three months, mostly for medication management. R. 40. She testified that she used illegal drugs only when she was "really depressed" and wanted to kill herself. R. 41. She had used marijuana in the last few weeks after she got out of the hospital and used it four or five times a month. She had not used cocaine in a few months and had used heroin three months ago. R. 42. She was not going to AA or a substance abuse support group. R. 43. The ALJ asked if she might feel better if she went to work and had a more structured life. In a stunning and telling statement, plaintiff stated: "that is a possibility. I've never tried[.]" R. 45.

On average, plaintiff had half good days and half bad days. R. 45. On a good day, she would wake up and take her medications and exercise, call a friend and see if they could go to the beach, or just get out of the house. R. 45-46. When she exercised, she would jog, bike, or play hockey with her brother and his friends. R. 47. She typically jogged three days a week. R. 48. On bad days, she did not leave her room and stayed in pajamas all day. She described herself as having a compulsive personality and thus, even on bad days, always got up and did her laundry. R. 45. She would make her bed and rearrange the room a few times while cleaning it. When getting ready to go out, she re-straightened her hair over and over, taking sometimes up to two hours. R. 51.

Mark Oberlander, a psychologist, testified about the Section 12 mental health listings, stating that plaintiff was moderately impaired in daily activities, social interactions, and concentration. R. 57. With regard to episodes of decompensation, an issue important to the analysis below, he provided the following underwhelming testimony:

---

[3] One can only wonder what clear thinking parents would allow plaintiff to be responsible for the care and safety of their child.

> We have no acceptable medical evidence going back to the [onset] date [of July 22, 2008], but the last two or three years no episodes – let me just see if there was – yeah, there's one hospitalization[] which would fit Social Security listing – Social Security definitions for a period of decompensation or deterioration. There's one or two.

R. 57. He did not identify what the "one or two" episodes were, nor did he specifically comment on several other hospitalizations that, as discussed below, arguably qualified as episodes of decompensation. He also opined that when plaintiff was not abusing drugs, she was capable of doing simple work. R. 59-60.

On July 13, 2012, the ALJ found plaintiff not disabled. The ALJ found that plaintiff had the following severe impairments: "asthma; history of a learning disorder; history of attention deficit hyperactivity disorder (ADHD); mild cognitive functional disorder; borderline intellectual functioning (BIF); a chronic dysthymia disorder with anxiety; obsessive-compulsive disorder (OCD); panic disorder; personality disorder; and polysubstance abuse."[4] In the listings portion of the opinion, the ALJ found that plaintiff did not meet any the Section 12 mental health listings—specifically Sections 12.02, 12.04, 1206, 12.08, and 12.09. The ALJ found that plaintiff had no more than moderate limitations in daily activities, social functioning, and concentration, persistence, or pace, and that she experienced "one to two" episodes of decompensation of extended duration. In the residual functional analysis ("RFC"), the ALJ found that plaintiff could perform the full range of work at all exertional levels, but that she would have to perform simple and routine work, primarily alone with only occasional contact with coworkers and supervisors,

---

[4] The ALJ did not mention which proposed impairments she rejected. However, the Court notes that the list of severe impairments did *not* include major depression, which several hospital doctors diagnosed plaintiff with, nor bipolar disorder, which Dr. Vemuri diagnosed her with. (Remember that between March 2010 and July 2012, plaintiff attempted suicide five times.) The closest related impairment would be "chronic dysthymia disorder with anxiety." Although surprisingly plaintiff did not complain about this point, the ALJ's failure to include depression and bipolar disorder is not explained and minimizes the severity of plaintiff's condition.

7

among other limitations. The ALJ found that plaintiff's subjective complaints were "not entirely" credible and "not fully" supported by the evidence. R. 85. Somewhat understandably, the ALJ faulted plaintiff for not attempting to work, for not going to regular counseling, for not consistently taking her medication, and for continuing to abuse substances. The ALJ also noted that plaintiff regularly performed a wide range of activities such as spending time with friends, watching movies, and jogging. The ALJ gave "little weight" to the opinion of Dr. Vemuri because he erroneously believed that plaintiff had abstained from drugs since July 2010, with only one relapse. R. 86. Instead, the ALJ gave "great weight" to the opinion of Dr. Oberlander, because he was a "psychological specialist," he was able to review all the medical evidence, and he was able to "observe her" while she testified. R. 86. Finally, the ALJ accepted the vocational expert's opinion that plaintiff would be able to work as a cleaner, an inspector, or a laundry worker. R. 88.

**DISCUSSION**

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). If the Commissioner's decision

lacks evidentiary support or adequate discussion, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). And, as the Seventh Circuit has repeatedly held, the federal courts cannot build the logical bridge on behalf of the ALJ. *See Jensen v. Colvin*, 2013 U.S. Dist. LEXIS 135452, *33-34 (N.D. Ill. 2013).

Plaintiff raises four arguments for remand: (i) the ALJ failed to follow the treating physician rule—and specifically failed to apply the checklist—in rejecting the opinion of plaintiff's treating psychiatrist; (ii) the ALJ improperly analyzed the "episodes of decompensation" requirement; (iii) the ALJ improperly discounted plaintiff's credibility; and (iv) the ALJ incorrectly analyzed plaintiff's RFC. All four arguments are interrelated. As explained below, the Court finds that the first two arguments support a remand. Because the second argument presents the most clear-cut argument, the Court will start there.

Plaintiff's second argument requires the Court to consider the meaning of the phrase "repeated episodes of decompensation, each of extended duration." This phrase is included in both the Paragraph B and Paragraph C criteria in the Section 12 mental health listings. Plaintiff has sought to qualify under several of them, arguing that if the ALJ had properly interpreted and applied this phrase, then she would have met one or more of the Section 12 listings. This phrase has not been analyzed extensively in the case law in this Circuit. In 2010, the Seventh Circuit

9

observed that the phrase is "vague" and not "self-defining." *Larson v. Astrue*, 615 F.3d 744, 747, 750 (7th Cir. 2010).

The obvious place to look for guidance is the introduction to Section 12, which sets forth the following two-paragraph explanation:

> *Episodes of decompensation* are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g. hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.
>
> The term *repeated episodes of decompensation, each of extended duration* in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.

As suggested by this explanation, the phrase contains three basic parts: definition, duration, and frequency. The first paragraph offers a general definition along with several examples of how a claimant could satisfy it. The paragraph states generally that an episode involves a significant increase in symptoms requiring "increased treatment" or the need for a "less stressful situation." As an example, the paragraph states that a "significant alteration in medication" would be sufficient. The paragraph also refers to the need for a "more structured psychological support system" (a phrase echoing "increased treatment" and "less stressful

10

situation") and gives further examples of being hospitalized or placed in a halfway house or highly structured household.

The next paragraph discusses the duration and frequency requirements, providing a bright-line test for each. Each episode must last "at least 2 weeks," and there must at least three in a one-year period. However, important to the discussion below, the paragraph also offers an alternative test if the episodes are shorter or less frequent. This is an equivalency analysis, directing the ALJ to assess whether the episodes are "of equal severity."

Aside from this explanation, the best other guidance is the Seventh Circuit's 2010 decision in *Larson*, a case involving similar facts and arguments as the present case. Plaintiff relied heavily on this case in her opening brief. Accordingly, *Larson* deserves close attention.

The Court addresses the facts of *Larson* first. Like plaintiff in this case, Lynn Marie Larson suffered from anxiety and depression as well as drug and alcohol abuse. 615 F.3d at 745. There were two discrete instances arguably qualifying as an episode of decompensation. In the first, referred to as a "nervous breakdown," she missed two weeks from her job as a part-time bus driver. *Id.* at 747. Apparently, she was not hospitalized. She then "self-medicated" with alcohol and marijuana. The second episode occurred in January 2006 when her psychotherapist, worried that Ms. Larson was having suicidal thoughts, contacted police who then took her to the hospital. The administrative record contained no other information about the length of the hospitalization. In addition, Ms. Larson's treating psychiatrist, Dr. Rhoades, checked a box on a form stating that Ms. Larson "was experiencing repeated (*i.e.*, three or more) episodes of decompensation."[5] *Id.* at 747. The medical expert at the administrative hearing, Dr. Carter,

---

[5] He did not indicate when or how long these episodes occurred. Presumably, one of the three qualifying episodes was the two-week nervous breakdown. Because the form was completed before the second discrete episode, it could not have been counted.

testified that plaintiff had no episodes of decompensation, an opinion the ALJ adopted over that of Dr. Rhoades.

The Seventh Circuit reversed, finding that the ALJ and Dr. Carter failed to sufficiently interpret and apply the decompensation requirement. The Seventh Circuit noted that Dr. Carter's testimony contained errors: he erroneously thought that plaintiff had not been hospitalized, thus ignoring the second episode; he did not "comment on" the two-week nervous breakdown; he did not "confront" the opinion of Dr. Rhoades that Ms. Larson had three episodes; and he did not consider that Ms. Larson had "frequent adjustments to her medications." *Id.* at 748.

As for the legal interpretation, the Seventh Circuit faulted the ALJ and Dr. Carter for taking a "too narrow" view of the decompensation requirement. *Id.* at 750. Relying on the Section 12 introduction quoted above, the Seventh Circuit emphasized that a hospitalization was not the only way to prove that an episode took place because there are, in fact, "many other scenarios" that qualify. *Id.* One such scenario was a "significant alteration in medication." *Id.* On its own initiative, the Seventh Circuit noted that Ms. Larson had a "long history of problems that have led to significant alterations in her medications." *Id.* The Seventh Circuit also faulted the ALJ for not considering the alternative, catch-all test under which shorter but more frequent episodes could be sufficient. The Seventh Circuit noted that a "fair reading of the record" indicated that Dr. Rhoades, when he checked the box indicating that Ms. Larson had three or more episodes, was essentially applying this equivalency test. *Id.* However, unfortunately for the district courts relying upon *Larson,* the Seventh Circuit did not specifically identify what the three episodes were. Therefore, it is not possible to glean any concrete standards regarding just how long or frequent the episodes need be to satisfy the equivalency test. As part of this analysis, the Seventh Circuit found that the ALJ's rejection of Dr. Rhoades' opinion violated the treating

12

physician rule because the ALJ failed to apply the required checklist of factors in assessing whether to give controlling weight to his opinion and, if not, in deciding what lesser weight should be given.

*Larson* is directly on point, both factually and legally, and thus justifies a remand.[6] Like Ms. Larson, plaintiff suffered from depression, used drugs and alcohol, had a series of breakdowns, and had a treating psychiatrist opine that she met the decompensation requirement. Also like Ms. Larson, plaintiff argues that the ALJ and the testifying expert ignored or misconstrued factual evidence, misapplied the decompensation requirement, and failed to apply the required checklist of factors under the treating physician rule. In a nutshell, the plaintiff's argument is that, over a roughly two-year period from the spring of 2010 until May 2012, she had numerous qualifying episodes of decompensation. These included not only the five suicide attempts and related hospitalizations, but also many instances where she was confined to her bed for days.

The ALJ only briefly discussed the decompensation requirement. At the beginning of the listings analysis, the ALJ summarized the decompensation requirement as follows: "Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." R. 78. Notably and

---

[6] Although plaintiff raised the decompensation argument in her opening brief and specifically cited to *Larson* (Dkt. #14 at 11), the Government in its response never addressed this argument in any way. Not surprisingly, plaintiff in her reply argued that the Government's failure is a waiver of the argument. (Dkt. #20 at 5.) Because the Court finds that a remand is warranted on the merits, the Court need not address the waiver argument. Just as this Court repeatedly chides plaintiffs' counsel for bringing meritless appeals, *see Martinez v. Colvin*, 2014 WL 1305067, *6 (N.D. Ill. Mar. 28, 2014), it also reminds the government that it must seriously consider voluntary remands when the record supports that decision. *See Strobach v. Colvin*, 2014 WL 1388285, *6 (N.D. Ill. Apr. 9, 2014). If an attorney must essentially ignore its opponent's primary – and valid – argument, then that is a good indication that voluntary remand is an appropriate option. This is particularly true because plaintiff's counsel will have incurred more fees by briefing the appeal. *Id.* These are fees the government will likely need to pay.

critically, the ALJ completely ignored the alternative test. A few paragraphs after this statement, the ALJ provided the following "analysis" (stated in full):

> As for episodes of decompensation, the claimant has experienced one to two episodes of decompensation, each of extended duration. The claimant had one hospital visit meeting the criteria in the spring of 2010. After her discharge in stable condition, she began seeking out treatment and had no more episodes of decompensation lasting long enough to be considered extended duration (Exhibits B3F, B4F).

R. 78.

This three-sentence explanation is insufficient under *Larson*. As a preliminary observation, this explanation is vague and bare-bones, forcing this Court to speculate about its basic factual predicates. Starting first with the ALJ's legal assumptions, the Court notes that, as in *Larson,* the ALJ and testifying medical expert appear to have taken a "too narrow" view. First, the ALJ's reference to "one hospital visit" meeting the criteria suggest that the ALJ may have believed that there was a hospitalization requirement. If so, then the ALJ may have erroneously excluded non-hospital episodes from the analysis. Plaintiff specifically argued that she often retreated to her bedroom and was effectively incapacitated for periods of time.[7] Second, the ALJ never acknowledged the catch-all equivalency test, raising a question of whether the ALJ was even aware of it or simply chose to ignore it. The ALJ's statement that, after the spring of 2010, plaintiff had no more episodes "lasting long enough" suggests that the ALJ was applying a duration requirement, presumably the two-week bright-line test. The failure to explicitly consider the equivalency test violates *Larson,* as well as the agency's own regulations.

Turning to the facts and how they were interpreted, the Court cannot follow the ALJ's reasoning and also has serious doubts whether she fully considered the entire record. The ALJ stated that plaintiff had "one to two" episodes meeting the criteria. Then, in the next sentence,

---

[7] Whether these shorter episodes are sufficient is a question that this Court need not address here because it is important that the ALJ first address this issue on remand.

the ALJ briefly referred to the "one hospital visit" in the spring of 2010. This explanation contains many large gaps. For one thing, did the ALJ believe that one *or* two episodes qualified? Putting this basic ambiguity aside, what was the *second* episode? The Court notes that plaintiff had two hospitalizations in the spring of 2010, one in March and one in April. Perhaps these are the two episodes being referred to. If so, then the Court is still in the dark about the ALJ's reasoning process because the ALJ presumably felt that one of these two visits clearly qualified while the other did not or maybe was a close call. What explains the difference? These two hospitalizations were similar duration (one was five days and the other six) with both involving alleged suicide attempts. This Court is hard pressed to discern a material difference. It appears the ALJ merely parroted the weak testimony of Dr. Oberlander.

More broadly and significantly, in the explanation above, the ALJ never specifically discussed the hospitalizations *after* the spring of 2010 other than to say that there were no episodes "lasting long enough."[8] This explanation fails to offer a coherent rationale as to why these later episodes, several of which were as long or longer than the two episodes in the spring of 2010, were not considered long enough. The two hospitalizations in the spring of 2010 were six and five days. Plaintiff was hospitalized in January 2011 for five days, in January 2012 for seven days, and in May 2012 for at least four days (maybe more). This Court again cannot discern any significant difference between these later hospitalizations and the two in the spring of 2010. The ALJ should have at least have confronted this evidence and provided a logical bridge from the evidence to her conclusions. *See Moore v. Colvin*, 743 F.3d 1118, 1124 (7th Cir. 2014) ("By failing to even acknowledge [the contrary] evidence, the ALJ deprived [the court] of any means to assess the validity of the reasoning process.").

---

[8] The ALJ did mention these post-2010 hospitalizations in the factual narrative portion later in the opinion. So she obviously was aware of them. But she never explicitly considered them in the decompensation analysis.

In sum, the Court agrees with plaintiff's second argument that the ALJ misapplied the decompensation requirement and that this failure justifies a remand under *Larson*. This conclusion is also further supported by plaintiff's first argument that the ALJ failed to follow the treating physician rule. As in *Larson*, the ALJ here failed to apply the required checklist factors.

The treating physician rule requires the SSA decision makers to "consider *all*" of the following factors in deciding the weight to give to *any* medical opinion: (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's degree of specialization; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)-(ii), (c)(3)-(6). These are the "checklist factors." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). They are designed to help the ALJ "decide how much weight to give to the treating physician's evidence." *Id.* But within the weighing process, treating physician opinions receive particular consideration. A treating physician's opinion is entitled to "controlling weight" if it is (i) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and if it is (ii) "not inconsistent with the other substantial evidence in [the] case." *Id.*; *Moore*, 743 F.3d at 1127. This is the first step in the process. If the ALJ does not give the treating physician's opinion controlling weight, the ALJ cannot simply disregard it without further analysis. *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). Instead, the ALJ must proceed to the second step and determine what specific weight, if any, the opinion should be given by using the checklist factors described above. *Moss v. Astrue¸* 555 F.3d 556, 561 (7th Cir. 2009); *Bauer*, 532 F.3d at 608.

Although the government agrees that the ALJ must *consider* the above six factors in the checklist, the government argues that the ALJ is not required to *explicitly discuss* them.

According to the government, it is enough if the ALJ gave "good reasons" that in turn allow for an inference that the ALJ *implicitly* considered the factors. (Dkt. # 19 at 5-6.) This is an argument the Government has asserted previously to this Court, and this Court has rejected, favoring those Seventh Circuit cases holding that ALJs must explicitly analyze the six factors, although this Court at the same time has recognized that it is an issue for which the Seventh Circuit has yet to provide a definitive answer. *Duran v. Colvin*, 2015 WL 4640877, * 8-9 (N.D. Ill. Aug. 4, 2015).

Even if the Court were to accept the government's position that an implicit analysis is permitted, the Court would still find that the ALJ's explanation was not adequate. The ALJ offered only one specific reason for finding that Dr. Vemuri's opinion was not credible. Dr. Vemuri stated in several reports that, although he initially thought that plaintiff's breakdowns may have been drug-induced, he no longer believed that to be the case because when the plaintiff stopped using drugs for six months in the latter half of 2010, the psychotic symptoms continued, thus demonstrating that the drug abuse was not the cause. The ALJ believed that Dr. Vemuri's statement was contradicted by hospital drug tests around this time showing that plaintiff was still using drugs. The ALJ reasoned that, because Dr. Vemuri based his opinion on a false premise, his opinion essentially deserved no weight.

The problem with this argument is not that it is factually incorrect, as plaintiff does not now dispute that she was using drugs. Instead, the problem is that the ALJ did not integrate it into a larger analysis of the decompensation issue. What seems to be lurking behind the ALJ's criticism of Dr. Vemuri, but is not addressed head-on, either in the ALJ's opinion nor in the parties' briefs nor even in the medical expert's testimony, is the issue of whether drug abuse rather than mental illness was the cause of plaintiff's hospitalizations. This is relevant because

17

the Social Security Act provides that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C); *Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006) ("When an applicant for disability benefits both has a potentially disabling illness and is a substance abuser, the issue for the administrative law judge is whether, were the applicant not a substance abuser, she would still be disabled").

Dr. Vemuri's opinion implicitly addresses this issue. In finding that Dr. Vemuri's statement was based on a false premise, the ALJ also seems to be obliquely referring to this issue. Thus, the ALJ apparently drew the broader conclusion that plaintiff would not have had multiple breakdowns if she were not using illegal drugs and alcohol. However, this conclusion is not adequately supported in the ALJ's opinion, as she did not explain her reasoning, nor consider the contrary evidence.

First, determining the possible causes of the breakdowns is separate from the questions of how often, how intense, and how long those breakdowns were. Dr. Vemuri's opinion focused more on the latter questions, which are part of the decompensation requirements discussed above. It is not clear to this Court whether his answers to those questions about frequency and duration would change if the cause were found to be due to drug abuse instead of mental illness.

Second, even if the ALJ discounted Dr. Vemuri's opinion entirely, the ALJ and the medical expert still should have explicitly discussed the larger question of whether drug use was the cause of mental illness. The ALJ's decision sends mixed signals. The ALJ found that one to two of the breakdowns qualified as episodes of decompensation. This could be interpreted to mean that, at least for these two episodes, the ALJ did not believe that they were caused

18

primarily by the drug addiction. If the ALJ was relying on the drug addiction rationale under §423, then presumably she would have found that there were *no* episodes given that she found that plaintiff was continuously using drugs throughout this period. Likewise, the ALJ stated at one point that plaintiff had "extended periods of stability." R. 86. If plaintiff continued to use drugs during extended periods of stability, then this at least raises a question as to whether there was another underlying variable—namely, the waxing and waning effect of her bipolar illness. *See Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) (remanding and noting that bipolar disorder "is by nature episodic and admits to regular fluctuations even under proper treatment").

Moreover, even if this Court were to accept the government's position that an ALJ can implicitly consider the checklist factors, the ALJ's analysis is faulty. For example, one checklist factor is the specialization of the physician. 20 C.F.R. §404.1527(c)(2). Here, the ALJ concluded that Dr. Oberlander was a "psychological specialist." R. 86. But, of course, Dr. Vemuri was a psychiatrist. A "psychological specialist" does not trump a psychiatrist. Another checklist factor is the length of treatment. 20 C.F.R. §404.1527(c)(2)(i). The purpose of this factor is to help ensure a longitudinal understanding of the applicant. Here, the ALJ found that the "psychological specialist" was able to "observe her" while plaintiff testified. R. 86. Obviously, observing a person testify for a short period of time via a video link-up between Evanston and Rockford does not provide nearly the same observational experience as that provided by a treating-physician relationship that lasted over one year.

In sum, having found that plaintiff's first two arguments justify a remand, this Court need not address the remaining two arguments. In remanding this case, this Court is "not suggesting that the ALJ [is] required to reach a certain conclusion" on remand but only that the ALJ provide

enough information to understand her reasoning process and to ensure that she considered the contrary evidence. *Moore*, 743 F.3d at 1124.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and the decision of the ALJ is remanded for further consideration.

Date:  October 16, 2015            By:      _____

                                                   Iain D. Johnston
                                                   United States Magistrate Judge